TREG R. TAYLOR
ATTORNEY GENERAL
Ronald W. Opsahl (Alaska Bar No. 2108081)
Senior Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: ron.opsahl@alaska.gov

Attorney for the State of Alaska

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| STATE OF ALASKA,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>UNITED STATES OF AMERICA,<br><br>　　　Defendant. | Civil Action No:<br><br>**COMPLAINT TO QUIET TITLE AND FOR DECLARATORY JUDGMENT** |

Plaintiff State of Alaska hereby brings this civil action against the above-listed defendant for declaratory and injunctive relief. Plaintiff alleges as follows:

## INTRODUCTION

1.　The State of Alaska (the "State"), through the office of the Attorney General, brings this action to quiet title to state-owned submerged land underlying Mendenhall Lake and the Mendenhall River, Alaska, as detailed below (the "Subject Submerged Lands").

2. Mendenhall Lake and the Mendenhall River, as described below, (the "Subject Waters") are navigable-in-fact waters within the boundaries of the State of Alaska, and the State obtained ownership to the Subject Submerged Lands on the date of statehood pursuant to the Equal Footing Doctrine, the Submerged Lands Act, and the Alaska Statehood Act.

3. The State brings this action to quiet title because the United States claims ownership to the Subject Submerged Lands underlying the Subject Waters, as described below. This claim of federal ownership creates a cloud on the State's title and causes uncertainty regarding the ownership, use, management, and control of the State's submerged lands.

## JURISDICTION AND VENUE

4. The State brings this action under the Quiet Title Act ("QTA"), 28 U.S.C. § 2409a, which authorizes a federal district court to adjudicate disputes over the title to real property in which the United States claims an interest, and under the Declaratory Judgment Act, 28 U.S.C. § 2201, which authorizes a federal district court to declare the rights and legal relations of an interested party seeking such a declaration.

5. This Court has jurisdiction over this action because the QTA waives sovereign immunity of the Federal government to resolve disputes over the title to real property in which the United States claims an interest. *Id*.

6. The State satisfied the QTA's requirement to provide 180-days' notice of intent prior to the initiation of this action. *See* 28 U.S.C. § 2409a(m). By letter dated

April 26, 2022, the Office of the Attorney General for the State of Alaska provided notice of its intent to file suit regarding the ownership of the Subject Submerged Lands underlying the Subject Waters to Honorable Deb Haaland Secretary of the Interior. Secretary Haaland received this notice on May 2, 2022. *See* Ex. 1 (attached hereto).

7. This is an action brought by a state and is timely under 28 U.S.C. § 2409a(g).

8. Federal district courts have exclusive original jurisdiction over civil actions arising under the QTA. 28 U.S.C. § 1346(f).

9. Venue is proper in this Court under 28 U.S.C. § 1391(e) because the lands at issue in this lawsuit are located within the District of Alaska.

10. A case or controversy has arisen over the State's ownership of the submerged lands described herein and its jurisdiction to regulate and control this land.

## PARTIES

11. The Plaintiff State of Alaska is a sovereign state, with a sovereign interest in the management and conservation of the beds of navigable rivers and other navigable waters and submerged lands to which it has title, including the Subject Submerged Lands. In bringing this lawsuit, the State seeks to confirm its right to manage its own lands, and to remediate and prevent the attendant harm of being deprived of this right.

12. Defendant United States of America ("United States") is a sovereign nation and claims an interest in the Subject Submerged Lands, as more fully set forth below.

## DESCRIPTION OF THE SUBJECT WATERS AND SUBMERGED LANDS

13. Mendenhall Lake is a glacial lake located approximately four miles north of downtown Juneau, Alaska and was formed by the receding Mendenhall Glacier. Mendenhall Lake outflows into the Mendenhall River. The entirety of Mendenhall Lake is subject to this action, including all submerged lands between the ordinary high water marks within T. 40 S., R. 66 E., Copper River Meridian ("CRM") and T. 39 S., R. 66 E., CRM, adjacent to the Tongass National Forest.

14. The Mendenhall River originates in Mendenhall Lake. It flows generally southward six miles to its outlet to Gastinaeu Channel at Juneau International Airport. The portion of the Mendenhall River that constitutes the subject matter of this action begins at the outlet of Mendenhall Lake to the Mendenhall Loop Road bridge, including all submerged lands between the ordinary high water marks within T. 40 S., R. 66 E., CRM, but excludes the Mendenhall River adjacent to private property along the River's right bank.

15. The Subject Waters have been used, and were susceptible of being used, in their natural and ordinary condition, as highways of commerce, over which trade and travel were or may have been conducted in the customary modes of trade and travel on water before Alaska became a state in 1959, and continued in that condition though the time of statehood.

## THE STATE'S TITLE TO THE SUBJECT SUBMERGED LANDS

16. The Equal Footing Doctrine of the U.S. Constitution guarantees to newly-admitted states the same rights enjoyed by the original thirteen states and other previously-admitted states. *Utah v. United States*, 482 U.S. 193, 196 (1987); *Alaska v. Ahtna, Inc.*, 891 F.2d 1401, 1404 (9th Cir. 1989). This includes title ownership to lands underlying navigable and tidally influenced waters. *Utah*, 482 U.S. at 196.

17. In part, Congress codified the Equal Footing Doctrine with the Submerged Lands Act of 1953, and expressly vested in the states "title to and ownership of lands beneath navigable waters within the boundaries of respective States." 43 U.S.C. § 1311(a) (2012).[1] Congress expressly extended applicability of the Submerged Lands Act to Alaska in the Alaska Statehood Act. Pub. L. 85-508, § 6(m), 72 Stat. 339 (1958) (codified at 48 U.S.C. note prec. § 21).

18. Unless a valid pre-statehood withdrawal clearly included the Subject Submerged Lands and evinced an unambiguous intent to defeat Alaska's statehood title, Alaska was granted ownership of the Subject Submerged Lands by operation of law at

---

[1] In pertinent part, the Submerged Lands Act defines "lands beneath navigable waters" as:
> all lands within the boundaries of each of the respective States which are covered by nontidal waters that were navigable under the laws of the United States at the time such State became a member of the Union, or acquired sovereignty over such lands and waters thereafter, up to the ordinary high water mark as heretofore or hereafter modified by accretion, erosion, and reliction[.]

43 U.S.C. § 1301(a)(1).

statehood. *See United States v. Holt State Bank*, 270 U.S. 49, 55 (1926) (citing *Shively v. Bowlby*, 152 U.S. 1, 49, 57, 58 (1894)).

19. Congress has made no pre-statehood withdrawal that would defeat Alaska's title to the Subject Submerged Lands.

20. Thus, Alaska's title to the Subject Submerged Lands vested at statehood on January 3, 1959 by operation of the Equal Footing Doctrine, the Submerged Lands Act, and the Alaska Statehood Act.

## UNITED STATES' PURPORTED OWNERSHIP OF THE SUBJECT SUBMERGED LANDS

21. Despite the State's title to the Subject Submerged Lands vesting at statehood, the United States has failed to acknowledge the State's ownership. Instead, the United States has claimed that the Subject Waters were the subject of a pre-statehood withdrawal, and hence did not convey to the State at statehood.

22. Since 1960, the Tongass National Forest has implemented the Mendenhall Glacier Recreation Area Management Plan, by which the Forest Service purports to regulate the public's use of the Subject Waters.

23. In April 1996, the Tongass National Forest issued its Mendenhall Glacier Recreation Area 1996 Management Plan ("1996 Management Plan"), revising and updating its prior plans. In the 1996 Management Plan, the Forest Service identifies the Mendenhall Lake Unit, which includes all of the Subject Waters. Though the 1996 Management Plan, the Forest Service regulated the public's use of the Subject Waters, and restricted that use to non-motorized use only.

24. In 2015, the Tongass National Forest issued its Decision Notice and Finding of No Significant Impact, Mendenhall Glacier Recreation Area, Management Plan Revision, Commercial Guide, Outfitter and Transport Service ("2015 Plan Revision"). Through the 2015 Plan Revision, the Forest Service continued to restrict the public's use of the Subject Waters, and revised it commercial allocation for guide, outfitter, and transport services, including commercial boat use on the Subject Waters.

25. In March 2022, the Tongass National Forest released its Mendenhall Glacier Visitor Facility Improvements Project Draft Environmental Impact Statement ("2022 DEIS"). Through the 2022 DEIS, the Forest Service again proposes to regulate the public's use of the Subject Waters.

26. By letter dated June 29, 2022, Secretary of Agriculture Vilsack stated, "the submerged lands underlying some waterbodies, such as Mendenhall Lake and the uppermost portion of Mendenhall River, were reserved to Federal ownership prior to Alaska statehood and retained in Federal ownership at statehood."

27. By letter dated August 8, 2022, Tongass National Forest Supervisor Stewart stated, "the bed of Mendenhall Lake and the uppermost portion of Mendenhall River were reserved to federal ownership prior to Alaska statehood and retained in federal ownership at statehood."

28. The Forest Service's continuous regulation of the public's use of the Subject Waters, and the statements by Secretary Vilsack and Supervisor Stewart,

demonstrates the United States' position that it, not the State, owns the Subject Submerged Lands.

29. The United States continued assertion of ownership of the Subject Submerged Lands casts a cloud on the rights and title of the State to the Subject Submerged Lands.

### THE CREATION OF THE MENDENHALL LAKE SCENIC AND WINTER SPORTS AREA

30. By Proclamation No. 846, issued February 16, 1909, President Roosevelt expanded the Tongass National Forest to include the Mendenhall Valley and area surrounding the Subject Submerged Lands.

31. On February 7, 1922, President Harding issued Proclamation No. 1620, which excluded lands, including the Subject Submerged Lands underlying the Mendenhall River, from the Tongass National Forest, reopening those lands to occupation, settlement, and disposal, and was known as the "Mendenhall Valley Elimination."

32. The Mendenhall Valley Elimination was platted in U.S. Survey No. 1536, which shows the area eliminated from the Tongass National Forest extending from near the terminus of Mendenhall Glacier, as it then-existed, along the Mendenhall River, to Gastineau Channel.



33. On March 20, 1935, Tongass Regional Forester Charles Flory administratively designated the Mendenhall Lake Recreation Area, including a rifle range, for "development along various recreational lines."

34. On June 27, 1935, President Roosevelt issued Executive Order No. 7088, which added approximately 553.7 acres to the Tongass National Forest, including the Subject Submerged Lands underlying the Mendenhall River.

35. Executive Order No. 7088 was platted in U.S. Survey No. 2385.



36. On May 14, 1947, Tongass Regional Forester B. Frank Heintzleman classified the Mendenhall Lake Recreation Area, including the rifle range, for "Public Recreation Use."

37. Beyond use of the rifle range, neither the March 20, 1935 designation nor the May 14, 1947 classification specified any other recreational use of the Mendenhall Lake Recreation Area.

38. On May 16, 1952, Secretary of Interior Oscar L. Chapman issued Public Land Order No. 829 which, inter alia, created the Mendenhall Lake Scenic and Winter Sports Area within the Tongass National Forest.



*State of Alaska v. United States*  Civil Action No. _____
Complaint  Page 11 of 20

## NAVIGABILITY OF THE SUBJECT SUBMERGED LANDS

39. The Subject Waters are boatable by watercraft customary at statehood, or by modern watercraft meaningfully similar to watercraft customary at statehood, in use anywhere in the United States at the date the State achieved statehood.

40. The Mendenhall Glacier has been a local, national, and international destination since the 1920s, and has afforded its visitors with boating opportunities on the Subject Waters utilizing various watercraft, including canoes, kayaks, inflatable rafts, and motorboats.

41. The Tongass National Forest authorizes and permits commercial use of the Subject Waters for tourism and recreational purposes.

42. The Tongass National Forest currently reports visitor capacity for non-motorized boat use of the Mendenhall Lake as 32,480 service days annually, and non-motorized boat use of Mendenhall River as 30,000 service days annually. Fifty percent of this visitor capacity is allocated for commercial use.

43. To support the extensive boat use of Mendenhall Lake and River, the Tongass National Forest has installed and maintains several hardened shoreline areas, boat launches, and docks accessing the Subject Waters.

44. In the 2019 DEIS, the Tongass National Forest proposes to install additional boat docks within the Subject Waters.

45. In the 2019 DEIS, the Tongass National Forest proposes to permit commercial motorboats capable of carrying 35 and/or 49 passengers using the Subject Waters.

46. In the 2019 DEIS, the Tongass National Forest proposes to allow motorized boat use of Mendenhall Lake of up to 214,000 service days annually; non-motorized boat use of Mendenhall Lake of 64,200 service days annually; and non-motorized boat use of Mendenhall River of 64,200 service days annually. Fifty percent of the proposed non-motorized use is allocated for commercial use; 100 percent of the proposed motorized use is allocated for commercial use.

47. In 2019, actual commercial use of Mendenhall Lake was reported as 15,066 service days; actual commercial use of Mendenhall River was reported as 17,320 service days.

48. The Subject Waters were in their natural and ordinary conditions at the time of statehood and remain in their natural and ordinary conditions today.

49. The Subject Waters were navigable-in-fact as they were used or were susceptible of being used in their ordinary condition as a highway for commerce over which trade and travel may be conducted in the customary modes of trade and travel, including, but not limited to, the following specific uses: (a) in its fluid capacity as a highway—floating of logs, use by wooden and skin boats, log and inflatable rafts, power and jet boats, and canoes providing transportation for individuals and supplies, for subsistence and recreational guided and non-guided hunting and fishing activities, for

trapping, mining and prospecting, freighting and similar purposes, related to commerce and travel; and (b) any other additional uses the State proves at trial.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment – No Pre-Statehood Withdrawal)

50. Plaintiff realleges the allegations contained in paragraphs 1–52 above.

51. Unless a valid pre-statehood withdrawal clearly included the Subject Submerged Lands and evinced an unambiguous intent to defeat Alaska's statehood title, Alaska was granted ownership of the Subject Submerged Lands by operation of law at statehood. *See United States v. Holt State Bank*, 270 U.S. 49, 55 (1926) (citing *Shively v. Bowlby*, 152 U.S. 1, 49, 57, 58 (1894)).

52. Neither creation of the Tongass National Forest nor its expansion in 1909 to include the Subject Waters withdrew the Subject Submerged Lands from operation of the Equal Footing Doctrine, Submerged Lands Act, or Alaska Statehood Act. *See, e.g.*, *Alaska v. United States*, 546 U.S. 413 (2006) (United States disclaimed marine submerged lands within the Tongass National Forest); *Alaska v. United States*, No. 3:15-cv-0226-RRB, Order Confirming Quiet Title Act Disclaimer (D. Alaska June 28, 2016) (United States disclaimed submerged lands under the Stikine River within 1909 Tongass National Forest expansion).

53. Executive Order No. 7088, which added portions of the Mendenhall River to the Tongass National Forest, contains no language demonstrating an intent to withdraw any of the Subject Submerged Lands from operation of the Equal Footing Doctrine, Submerged Lands Act, or Statehood Act.

54. The March 20, 1935 administrative designation of the Mendenhall Lake Recreation Area by Regional Forester Flory contains no language demonstrating an intent to withdraw any of the Subject Submerged Lands from operation of the Equal Footing Doctrine, Submerged Lands Act, or Statehood Act.

55. The May 14, 1947 land use classification of the Mendenhall Lake Recreation Area by Regional Forester Heintzleman contains no language demonstrating an intent to withdraw any of the Subject Submerged Lands from operation of the Equal Footing Doctrine, Submerged Lands Act, or Statehood Act.

56. The March 20, 1935 designation and the May 14, 1947 classification were administrative only, and could not have withdrawn any of the Subject Submerged Lands from operation of the Equal Footing Doctrine, Submerged Lands Act, or Statehood Act because the Regional Forester was not authorized by Congress or the President to make such a withdrawal.

57. Executive Order No. 829, issued by Secretary Chapman which officially created the Mendenhall Lake Scenic and Winter Sports Area, contains no language demonstrating an intent to withdraw any of the Subject Submerged Lands from operation of the Equal Footing Doctrine, Submerged Lands Act, or Statehood Act.

58. Executive Order No. 829 was issued under the authority granted by 16 U.S.C. § 473 and Executive Order No. 9337.

59. 16 U.S.C. § 473 provides:

The President of the United States is authorized and empowered to revoke, modify, or suspend any and all Executive orders and proclamations or any

part thereof issued under section 471 of this title, from time to time as he shall deem best for the public interests. *By such modification he may reduce the area or change the boundary lines or may vacate altogether any order creating a national forest.*

16 U.S.C. § 473 (emphasis added).

60. 16 U.S.C. § 473 provides limited authority to reduce, change, or revoke boundaries of national forests; it does not provide authority to withdraw submerged lands from operation of the Equal Footing Doctrine, Submerged Lands Act, or Alaska Statehood Act.

61. Executive Order No. 9337 delegates authority provided by the act of June 25, 1910, ch. 421, 36 Stat. 847, to the Secretary of the Interior.

62. Executive Order No. 9337 contains no authority to withdraw submerged lands from operation of the Equal Footing Doctrine, Submerged Lands Act, or Alaska Statehood Act.

63. The act of June 5, 1910, ch. 421, 36 Stat. 847, provided:

That the President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States including the District of Alaska and reserve the same for water-power sites, irrigation, classification of lands, or other public purposes to be specified in the order of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress.

Sec. 2. That all lands withdrawn under the provisions of this Act shall at all times be open to exploration, discovery, occupation, and purchase, under the mining laws of the United States, so far as the same apply to minerals other than coal, oil, gas, and phosphates.

64. The act of June 25, 1910, ch. 421, 36 Stat. 847, contains no authority to withdraw submerged lands from operation of the Equal Footing Doctrine, Submerged Lands Act, or Alaska Statehood Act.

65. Pursuant to 28 U.S.C. § 2201, the State is entitled to a declaration that no pre-statehood withdrawal in effect at the time of statehood defeated the State's interest in Subject Submerged Lands.

**SECOND CLAIM FOR RELIEF**
**(Quiet Title)**

66. Plaintiff realleges the allegations contained in paragraphs 1–68 above.

67. Pursuant to 28 U.S.C. § 2409a, the United States is subject to suit to quiet title to real property in which both the State and the United States claim an interest.

68. The Subject Waters were navigable-in-fact at the time of statehood, and there were no valid pre-statehood withdrawals in effect for these disputed areas that defeated the State's interest in the submerged lands. Therefore, title to the Subject Submerged Lands transferred to the State as a matter of law pursuant to the Equal Footing Doctrine, the Submerged Lands Act, and the Alaska Statehood Act.

69. The State is entitled to an order of this Court quieting title to the Subject Submerged Lands.

**THIRD CLAIM FOR RELIEF**
**(Declaratory Judgment – Mendenhall Lake Following Glacial Retreat)**

70. Plaintiff realleges the allegations contained in paragraphs 1–72 above.

71. Mendenhall Glacier has been receding for the last 200 years. From 1998 to 2018, Mendenhall Glacier retreated an average of 170 feet per year.

72. By 2050, Mendenhall Glacier is predicted to be land-terminating. That is, it is predicted that the terminus of the Glacier will no longer from the northern boundary of Mendenhall Lake, but will occur on dry land.

73. Accordingly, the bed of Mendenhall Lake is expected to increase in area as Mendenhall Glacier recedes.

74. The effect of glacial retreat or advance on the ambulatory boundary between state-owned submerged lands and federally owned uplands presents a question of first impression.

75. A defining feature of the ordinary high water mark as an ownership boundary is that it is ambulatory, changing as the river or lake bed changes due to processes such as erosion, accretion, and reliction. *See* 43 U.S.C. § 1301(a)(1) (defining "lands beneath navigable waters" to include lands "hereafter modified by accretion, erosion, and reliction"); *United States v. Milner*, 583 F.3d 1174, 1187 (9th Cir. 2009) ("Under the common law, the boundary between the tidelands and the uplands is ambulatory; that is, it changes when the water body shifts course or changes in volume. The uplands owner loses title in favor of the tideland owner–often the state–when land is lost to the sea by erosion or submergence. The converse of this proposition is that the littoral property owner gains when land is gradually added through accretion, the

accumulation of deposits, or reliction, the exposure of previously submerged land." (internal citations omitted)).

76. The processes leading to glacial retreat are analogous to the processes causing erosion of the banks of a lake or river. In both instances, these processes result in the expansion of the bed of the lake or river and the creation or exposure of additional submerged lands.

77. In erosion and accretion, as well as with glacial advance and retreat, "The owner takes the chances of injury and of benefit arising from the situation of the property. If there be a gradual loss, he must bear it; if, a gradual gain, it is his." *County of St. Clair v. Lovingston*, 90 U.S. (23 Wall.) 46, 68-69 (1874).

78. Pursuant to 28 U.S.C. § 2201, the State is entitled to a declaration that defines the rights of the State and the United States and recognizes the ambulatory nature of the boundary of State-owned Subject Submerged Lands caused by the retreat or advance of Mendenhall Glacier.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff State of Alaska prays as follows:

1. That this Court declare that no pre-statehood withdrawals in effect at the time of statehood defeated the State's interest to the Subject Submerged Lands.

2. That this Court enter an order quieting title in the State of Alaska to the Subject Submerged Lands, and declaring that the United States has no title thereto or interest therein.

3. That this Court enter an order declaring that State ownership of the Subject Submerged Lands will continue to be ambulatory, following the retreat or advance of Mendenhall Glacier.

4. That the Plaintiff State of Alaska be awarded costs and attorney's fees.

5. For such further and other relief as the Court may deem just and proper.

DATED: November 1, 2022 at Anchorage, Alaska.

TREG R. TAYLOR
ATTORNEY GENERAL

By: */s/ Ronald W. Opsahl*
Ronald W. Opsahl (Alaska Bar No. 2108081)
Senior Assistant Attorney General
Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, Alaska 99501
Telephone: (907) 269-5232
Facsimile: (907) 279-2834
Email: ron.opsahl@alaska.gov

Attorney for the State of Alaska