| | |
|---|---|
| STATE OF ALASKA,<br><br>    Plaintiff,<br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | Case No. 3:22-cv-0240-SLG |

## ORDER ON MOTION TO DISMISS

Before the Court at Docket 8 is the United States' Motion to Dismiss. Plaintiff State of Alaska ("State") responded in opposition at Docket 11, to which the United States replied at Docket 12. The Court heard oral arguments on the motion on May 3, 2024. For the reasons set forth below, the United States' motion is **GRANTED**.

## BACKGROUND[1]

This case is an action brought by the State pursuant to the Quiet Title Act, 28 U.S.C. § 2409a, seeking to quiet title against the United States to submerged

---

[1] The facts herein are as alleged in the State's Complaint at Docket 1, or contained in documents incorporated by reference into the Complaint (reproduced by the parties at Docket 8-2–8-7, 8-10, 8-12, 8-15, and 8-17, and Docket 11-2,11-4, 11-5, 11-11–11-14, and 11-20), or from public records of which the Court takes judicial notice (reproduced by the parties at Docket 8-8, 8-11, 8-19, 8-20, Docket 11-15–11-25, and Docket 12-1). The Court may consider these documents without converting the instant motion to dismiss into a motion for summary judgment. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688–89 (9th Cir. 2001) ("There are . . . two exceptions to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion. First, a court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment . . . . Second, under Fed. R. Evid. 201, a court may

lands beneath Mendenhall Lake and a portion of the Mendenhall River (the "Disputed Submerged Lands").[2]  The State also seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.[3]

Mendenhall Lake is a glacial lake formed by the receding Mendenhall Glacier and located approximately four miles north of downtown Juneau, Alaska.[4] The Mendenhall River originates at Mendenhall Lake and flows southward roughly six miles to its outlet.[5]  Both Mendenhall Lake and the upper part of the Mendenhall River lie within the Tongass National Forest.[6]

---

take judicial notice of 'matters of public record.'").

[2] Docket 1 at ¶¶ 1, 4,13–14 ("The entirety of Mendenhall Lake is subject to this action, including all submerged lands between the ordinary high water marks within T. 40 S., R. 66 E., Copper River Meridian ("CRM") and T. 39 S., R. 66 E., CRM, adjacent to the Tongass National Forest . . . .  The portion of the Mendenhall River that constitutes the subject matter of this action begins at the outlet of Mendenhall Lake to the Mendenhall Loop Road bridge, including all submerged lands between the ordinary high water marks within T. 40 S., R. 66 E., CRM, but excludes the Mendenhall River adjacent to private property along the River's right bank."). The State referred to these lands initially as the "Subject Submerged Lands" in its Complaint, and later as the "Disputed Lands" in its Response in Opposition to the United States' Motion to Dismiss. *Compare* Docket 1 at ¶ 1, *with* Docket 11 at 13.

[3] Docket 1 at ¶¶ 50–65, 70–78.

[4] Docket 1 at ¶ 13.

[5] Docket 1 at ¶ 14.

[6] The Disputed Submerged Lands are within the boundaries of the Tongass National Forest, as expanded in 1909. *See* Docket 8-2 (Presidential Proclamation No. 846).  In 1922, President Harding excluded from the Tongass a tract of land known as the Mendenhall Valley Elimination in order to open that land to homesteading. Docket 8-3.  The survey of the Elimination shows that, in 1922, Mendenhall Lake and the now-claimed uppermost portion of Mendenhall River did not exist in their current forms. *See* 8-4 at 1 (Plat of U.S. Survey No. 1536).  In 1935, President Roosevelt added a portion of the Elimination back to the Tongass, including the uppermost portion of the Mendenhall River. *See* Docket 8-5 (Executive Order No. 7088) and 8-6 (U.S. Survey 2385).

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 2 of 36
Case 3:22-cv-00240-SLG     Document 44     Filed 12/09/24     Page 2 of 36

In 1935, the Forest Service designated the "Mendenhall Lake Recreation Area," which it described as a "recreational area on National Forest land adjacent to Mendenhall Glacier."[7]  The designation noted that "plans have been made for [the area's] development along various recreational lines" and prohibited shooting except on the rifle range.[8]  Recreational development in the area commenced the following year; in 1936, the Civilian Conservation Corps built a "Skaters' Cabin" next to Mendenhall Lake.[9]  In 1947, the Forest Service mapped and classified the "Mendenhall Lake Recreation Area" for "Public Recreation Use" and closed the area to inconsistent occupancy and uses.[10]

In 1951, the Forest Service requested that the Secretary of the Interior (the "Secretary") withdraw "Mendenhall Lake" "from all forms of location and entry under the public land laws, including the U.S. Mining Laws" under the authority granted to the Secretary by the President and Congress.[11]  The Forest Service further requested that lands included in the withdrawal be subject to federal oil and

---

[7] Docket 8-7 (Forest Service Designation dated March 20, 1935).

[8] Docket 8-7.

[9] Docket 8-8 (National Park Service Nomination dated 1986) at 2.

[10] Docket 8-10 (Mendenhall Lake Recreation Area Classification dated May 14, 1947).

[11] Docket 8-11 (Letter Requesting Withdrawal dated August 3, 1951). The Secretary's authority to issue such a withdrawal flowed from the Pickett Act's authorization for the President to make withdrawals of public lands in certain cases, and the delegation of that authority to the Secretary of the Interior in Executive Order 9337. *See* Docket 11-21 (Executive Order No. 9337); Docket 11-22 (Act to authorize the President of the United States to make withdrawals of public lands in certain cases (Pickett Act), ch. 421, 36 Stat. 847 (1910)).

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 3 of 36

Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 3 of 36

gas leasing only if "no part of the surface of the lands shall be used in connection with prospecting, mining and removal of the oil and gas."[12] The request identified the purpose of withdrawing Mendenhall Lake as "Public Recreation, Scenic And Winter Sports."[13] The Disputed Submerged Lands are within the boundaries of the area that the Forest Service had requested to be withdrawn.[14]

In response to the Forest Service's request, in May 1952, the Secretary issued Public Land Order No. 829 ("PLO 829").[15] PLO 829 was published in the Federal Register,[16] and issued under the authority vested in the President by the Pickett Act and delegated to the Secretary in Executive Order 9337 to make withdrawals of public lands in certain cases.[17] PLO 829 withdrew the "Mendenhall Lake Scenic and Winter Sports Area" within the Tongass National Forest "from all forms of appropriation under the public-land laws, including the mining laws but not the mineral-leasing laws" and reserved it "for use by the Forest service" as a recreation area.[18] Part of the boundary of the withdrawn area was defined by, and

---

[12] Docket 8-11 at 1.

[13] Docket 8-11 at 1.

[14] *See* Docket 8-11 at 3.

[15] Docket 8-12 (PLO 829) at 1; *see also* Docket 1 at ¶ 38.

[16] 17 Fed. Reg 4709 (May 23, 1952).

[17] Docket 8-12; Docket 11-21; *see supra* note 11.

[18] Docket 8-12; *see also* Docket 1 at ¶ 38.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 4 of 36

inclusive of, a portion of the Mendenhall River.[19] The withdrawn area, like the requested area, included the Disputed Submerged Lands within its boundaries.[20]

The reservation of "Mendenhall Lake" was then listed in a June 1952 Checklist of Orders Affecting Public Lands in Alaska.[21] In July 1958, the Secretary sent Congress an atlas with maps of the approximate locations of federal withdrawals and reservations.[22] The atlas referred Congress to the Checklist of Orders Affecting Public Lands.[23]

Alaska became a state on January 3, 1959. At the time of statehood, the Disputed Submerged Lands were within the exterior boundaries of the Mendenhall Lake Scenic and Winter Sports Area.[24] Since statehood, the United States has continuously regulated the public's use of the area, including use of the waters above the Disputed Submerged Lands.[25]

---

[19] *See* Docket 8-12 at 2 ("[T]hence by meanders on . . . west shore [of Mendenhall River.]").

[20] *See* Docket 8-12 at 2; Docket 8-10 at 3 (map of classification showing survey boundaries adopted in PLO 829).

[21] Docket 12-1 (Checklist of Orders Affecting Public Lands in Alaska dated June 1952).

[22] Docket 8-20 (excerpt of Federal Land Withdrawals and Reservations dated July 1958).

[23] Docket 8-20 at 3.

[24] Following statehood, on July 25, 1983, the United States partially revoked PLO 829 to allow the State to select a tract of land adjacent to Mendenhall River. In 1991, the United States conveyed these State-selected uplands to the State but asserted at that time that it retained ownership of the lands covered by the Mendenhall River. Docket 8 at 9–10; *see* Docket 8-17 at 1 (Dependent Resurvey of a Portion of the South Boundary, and Subdivision of U.S. Survey No. 2385) (Lot 1, conveyed to the State, is bounded by Mendenhall River; Lot 2, retained by the United States, includes Mendenhall River).

[25] *See* Docket 1 at ¶¶ 21–24, 28.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 5 of 36

Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 5 of 36

The State filed this action to quiet title in November 2022.[26] The State asserts that title to the Disputed Submerged Lands passed from federal ownership to the State at the time of statehood by operation of the equal footing doctrine, the Submerged Lands Act, and the Alaska Statehood Act.[27] In March 2023, the United States filed the instant motion to dismiss for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).[28] The United States contends that the State's Complaint "must be dismissed because the United States reserved title to the lands the State seeks before Alaska became a state and because the United States expressed its intent to retain title through statehood."[29]

The Court has subject matter jurisdiction over this case pursuant to the Quiet Title Act, 28 U.S.C. § 2409a.[30]

## LEGAL STANDARD

A party may seek dismissal under Federal Rule of Civil Procedure 12(b)(6) for a complaint's "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible

---

[26] Docket 1.

[27] Docket 1 at ¶ 20.

[28] Docket 8.

[29] Docket 8 at 1.

[30] 28 U.S.C. § 1346(f) ("The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States.").

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 6 of 36
Case 3:22-cv-00240-SLG     Document 44     Filed 12/09/24     Page 6 of 36

on its face.'"[31]  Nonetheless, "the trial court does not have to accept as true conclusory allegations in a complaint or legal claims asserted in the form of factual allegations."[32]  A court may also take judicial notice of "matters of public record" such as land surveys and correspondence from or to federal agencies, pursuant to Federal Rule of Evidence 201.[33]

## DISCUSSION

"States enjoy a presumption of title to submerged lands beneath inland navigable waters within their boundaries[.]"[34] This presumption arises from both the equal footing doctrine and the Submerged Lands Act ("SLA"), 43 U.S.C. § 1331(a), which applies to Alaska through the Alaska Statehood Act ("ASA"), Pub. L. No. 85-508, § 6(m), 72 Stat. 339, 343 (1958). Under the equal footing doctrine, new states succeed to the United States' title to navigable waters within their boundaries upon joining the Union.[35]  The SLA "confirmed" and "established" the

---

[31] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[32] *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016).

[33] *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citations omitted); *Chemehuevi Indian Tribe v. McMahon*, Case No. 5:15-cv-1538-DMG (FFM), 2017 WL 6883765, at *6 (C.D. Cal. Sept. 5, 2017) (taking judicial notice of letters to the Commissioner of Indian Affairs, a letter from the Commissioner of Indian Affairs to the Secretary of the Interior, a land survey, and a trust patent), *aff'd in part, vacated in part on other grounds*, 934 F.3d 1076 (9th Cir. 2019).

[34] *Alaska v. United States* (*Glacier Bay*), 545 U.S. 75, 78 (2005).

[35] *Id.*

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 7 of 36

presumption of state title to "lands beneath navigable waters within the boundaries of the respective states."[36]

Nonetheless, "[t]he United States can defeat a future State's title to submerged lands . . . by setting submerged lands aside as part of a federal reservation" for "an appropriate public purpose."[37]  To determine if the United States has defeated a new state's title to submerged lands under navigable waters, courts "conduct a two-step inquiry."[38]  Courts "first inquire whether the United States clearly intended to include submerged lands within the reservation."[39]  "If the answer is yes, [courts] next inquire whether the United States expressed its intent to retain federal title to submerged lands within the reservation."[40]

The Complaint alleges—and the Court accepts as true for the purposes of this motion to dismiss—that the Disputed Submerged Lands lie under waters that were navigable at the time of statehood.[41]  The State therefore begins with a

---

[36] 43 U.S.C. § 1311(a). The SLA "also establishes States' title to submerged lands beneath a 3-mile belt of the territorial sea, which would otherwise be held by the United States." *United States v. Alaska* (*Arctic Coast*), 521 U.S. 1, 6 (1997).

[37] *Glacier Bay*, 545 U.S. at 100 (quoting *Idaho v. United States*, 533 U.S. 262, 273 (2001)); *Arctic Coast*, 521 U.S. at 34 ("Congress can also reserve submerged lands under federal control for an appropriate public purpose[.]")

[38] *Glacier Bay*, 545 U.S. at 100.

[39] *Id.*

[40] *Id.* (citing *Arctic Coast*, 521 U.S. at 36).

[41] Docket 1 at ¶ 15.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 8 of 36

Case 3:22-cv-00240-SLG     Document 44     Filed 12/09/24     Page 8 of 36

"strong presumption" of title.[42]  However, the United States asserts that it reserved the Disputed Submerged Lands before Alaska became a state as part of the Mendenhall Lake Scenic and Winter Sports Area, and thus retained ownership of those lands following Alaska's statehood.[43]  The State agrees that the Disputed Submerged Lands lie within the boundaries of the Mendenhall Lake Scenic and Winter Sports Area, but maintains that the United States has not demonstrated the requisite intent to retain ownership of the submerged lands.[44]

## I.        Clear Federal Intent to Reserve Submerged Lands

Under the first prong of the two-step inquiry, the United States must demonstrate that it "clearly intended to include submerged lands within the reservation."[45]  The United States contends that it clearly intended to reserve the Disputed Submerged Lands for four reasons: (1) excluding the Disputed Submerged Lands from the Mendenhall Lake Scenic and Winter Sports Area would undermine the purpose of the reservation, (2) the reservation uses the outer edge of the Disputed Submerged Lands as its exterior boundary, (3) the

---

[42] *See Montana v. United States*, 450 U.S. 544, 552 (1981).

[43] *See generally* Docket 8.

[44] *See generally* Docket 11.

[45] *Glacier Bay*, 545 U.S. at 100.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 9 of 36

reservation includes the Disputed Submerged Lands in its reporting of the acreage reserved, and (4) the reservation is named after "Mendenhall Lake."[46]

The State responds that the purpose of the reservation does not require that the United States retain title to the Disputed Submerged Lands, that the use of a riparian landmark as a boundary is insufficient to demonstrate an intent that the submerged lands be included within the withdrawal, that the inclusion of the acreage corresponding to the Disputed Submerged Lands in the calculation of total acres withdrawn is similarly insufficient to demonstrate an intent that the submerged lands be included in the withdrawal, and that the reservation's name indicates only the general area of the reservation.[47]

### A.  Purpose of the Reservation

"[T]he purpose of a . . . reservation is a critical factor in determining federal intent."[48] Where the purpose of a federal reservation would be undermined if submerged lands were not included in the reservation, the Supreme Court has consistently held that the federal government intended to reserve the submerged lands.[49] For example, in *Arctic Coast*, the Supreme Court held that the United

---

[46] *See* Docket 8 at 2.

[47] Docket 11 at 26–33; Docket 41 at 25 (Oral Arg. Tr.).

[48] *Arctic Coast*, 521 U.S. at 39 (emphasis omitted).

[49] *See*, *e.g.*, *Glacier Bay*, 545 U.S. at 102 (upholding special master's conclusion that the federal government intended to reserve submerged lands under Glacier Bay where the "purposes for creation of the monument . . . would be compromised were it to be determined that submerged lands were not included in the monument"); *Alaska Pac. Fisheries v. United States*, 248 U.S. 78, 87–89 (1918) (holding that reservation of "body of lands" in southeastern

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 10 of 36

States intended to include submerged tidelands in a petroleum reserve because "[t]he purpose of reserving in federal ownership all oil and gas deposits within the Reserve's boundaries would have been undermined if those deposits underlying lagoons and other tidally influenced waters had been excluded."[50]  And in the same case, the Supreme Court also held that the United States must have intended to include submerged lands in the Arctic National Wildlife Refuge because the waters were habitat for the wildlife that the refuge sought to protect.[51]

PLO 829 reserved lands within the Chugach and Tongass National Forests, including the Mendenhall Lake Scenic and Winter Sports Area, "as administrative sites, recreation areas, or for other public purposes."[52]  The parties agree that the purpose of PLO 829, as it relates to the Mendenhall Lake Scenic and Winter Sports Area,[53] was to reserve lands for recreational activities, such as ice skating on Mendenhall Lake, and uplands activities like hiking, shooting and camping.[54]  The Forest Service's letter requesting that Mendenhall Lake be withdrawn indicates

---

Alaska for Metlakatla Indians included adjacent waters and submerged lands, because fishing was necessary for Metlakatlans' subsistence); *see also United States v. State of Alaska (Tustumena Lake)*, 423 F.2d 764, 767 (9th Cir. 1970) (holding that an Executive Order reserving the Kenai Moose Range for the purpose of "protecting the natural breeding and feeding range of the giant Kenai moose" intended to reserve submerged lands because water is "essential to the continued existence of the moose").

[50] *Arctic Coast*, 521 U.S. at 39–40.

[51] *Id.* at 51.

[52] Docket 8-12.

[53] *See* Docket 8-12 at 2.

[54] Docket 8 at 7; Docket 11 at 32.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 11 of 36

that the purpose of the request was "Public Recreation, Scenic And Winter Sports."[55] PLO 829's description of the area as a "Scenic and Winter Sports" area confirms that the area was withdrawn for these same purposes.[56] Consistent with these purposes, PLO 829 specifically withdrew the Mendenhall Lake Scenic and Winter Sports Area "from all forms of appropriation under the public-land laws, including the mining laws."[57]

According to the United States, the State's ownership would undermine the purpose of the reservation because, "in other instances where the State has gained title to submerged lands not reserved before statehood, the State has opened the submerged lands to mining entry that . . . [is] inconsistent with scenic and recreational purposes."[58]    The State responded at oral argument by

---

[55] Docket 8-11.

[56] Docket 8-12 at 2.

[57] Docket 8-12 at 1. The United States maintains that pursuant to 30 U.S.C. § 49(a), submerged lands in Alaska were subject to exploration, disturbance, and mining under the U.S. mining laws and, therefore, PLO 829's withdrawal of the Mendenhall Lake from appropriation under the mining laws demonstrates an intent to preserve the submerged lands for scenic and recreational uses. Docket 8 at 17.

[58] Docket 8 at 17 (citing *Case, Land, and Water Information,* Alaska Department of Natural Resources,
https://dnr.alaska.gov/projects/las/#filenumber/613453/filetype/ADL/landflag/y/searchtype/casefile/reporttype/abstract).

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 12 of 36

suggesting that it would not open Mendenhall Lake to mining[59] and noted in its briefing that "[i]ce skating is not prohibited by State land regulations."[60]

The Court need not engage with the hypothetical of the State's potential future management of the Disputed Submerged Lands. Binding precedent makes clear that the proper inquiry is not how the State contends it would manage the submerged lands but whether the federal "concerns . . . that motivated" the reservation have "to do with the beds of navigable rivers and lakes."[61]

Here, the concerns that motivated the reservation had to do with the lakebed. The recreational and scenic uses for which the Disputed Submerged Lands were reserved were tied to the use of Mendenhall Lake. Public records describing the area before statehood suggest that the lake was a core component of the scenery intended to be preserved.[62] Further, the winter sport identified as the purpose of the reservation occurs on Mendenhall Lake itself; for ice skating, the lake must be accessed and its surface not disturbed. These uses make clear that the Secretary, in setting aside the reservation for Mendenhall Lake Scenic and Winter Sports Area through PLO 829, would not have thought that the reservation

---

[59] Docket 41 at 20 (referencing Kenai Lake, which is "closed to mining" as "an example of how the State manages an area this is prized for its recreational and scenic values").

[60] Docket 11 at 32, n.19 (citing Alaska Admin. Code tit. 11, § 96.020(a)(1)(A)).

[61] *Utah Div. of State Lands v. United States*, 482 U.S. 193, 203 (1987).

[62] Docket 8 at 8–9 (quoting Docket 8-14 (2 William J. Stanton, U.S. Dep't of the Interior, *Alaska Recreation Survey Part Two: A Recreation Program for Alaska*, 95 (1955))).

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 13 of 36
Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 13 of 36

included only uplands; rather, the federal concerns that motivated the reservation included protection of recreational activity on the lake itself.[63]

The State suggested at oral argument that the United States need not defeat the State's title to submerged lands to promote the purposes of the reservation since it always retains plenary authority to condemn lands.[64]  If this suggestion were correct, no court would ever find that the purpose of a reservation would be undermined by the failure to include submerged lands, because the federal government could simply condemn those lands.  Binding precedent requires that the Court reject this approach.[65]

Accordingly, the Court finds that excluding submerged lands from the reservation would compromise its purpose of safeguarding the reserved area's recreational and scenic value.[66]

---

[63] *See Arctic Coast*, 521 U.S. at 51 (concluding, based on the purpose of the reservation, that the "drafters of the application would not have thought that the habitats mentioned were only upland").

[64] Docket 41 at 28.

[65] *See*, *e.g.*, *Glacier Bay*, 545 U.S. at 102 (concluding that the United States clearly intended to reserve submerged lands based on the purpose of the reservation). The State's assertion is further contradicted by *Arctic Coast*. In *Arctic Coast*, the Supreme Court rejected the State's argument that Congress "had no reason to defeat State title to submerged lands since it always retains plenary authority to regulate navigable waters for defense purposes." 521 U.S. at 41 (internal quotation marks and citation omitted).

[66] *See Glacier Bay*, 545 U.S. at 102.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 14 of 36

### B. Bank of Mendenhall River as Boundary

Next, the United States asserts that the reservation was intended to include the submerged lands because PLO 829 uses the west bank of the Mendenhall River as part of the western boundary of the reservation.[67] The Supreme Court has held "that the fact that navigable waters are within the boundaries of a . . . reservation does not in itself mean that submerged lands beneath those waters were . . . reserved."[68] However, in *Arctic Coast*, the Supreme Court held that the United States expressed its intent to include submerged lands in a reservation when it used coastal landmarks to define the reservation's boundaries, thus creating a reserve "that necessarily embraced certain submerged lands."[69]

The State contends that "in the case of coastal submerged lands"—such as the lands at issue in *Arctic Coast*—"compared to an inland water [body], the location of the boundary is more likely to show an intent to include or exclude the submerged lands."[70] The State buttresses this distinction by observing that the equal footing doctrine only applies to submerged lands beneath tidal and inland waters and does not apply to coastal submerged lands, which are instead

---

[67] Docket 8-12 at 2 (including a western boundary description that starts at a point "on west shore Mendenhall River; thence by meanders on said west shore").

[68] *Arctic Coast*, 521 U.S. at 38 (internal citations omitted).

[69] *Arctic Coast*, 521 U.S. at 38–39 (emphasis omitted).

[70] Docket 11 at 27–28 (emphasis omitted).

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 15 of 36

transferred to states by the SLA alone.[71] The Supreme Court, however, saw "no reason" to apply a separate standard for reservations affecting submerged lands under inland navigable waters and those under the 3-mile belt of the territorial sea.[72] Therefore, this Court will not treat riparian landmarks differently from coastal landmarks for purposes of examining whether there was federal intent to reserve submerged lands.

In *Arctic Coast*, the Supreme Court considered two reservations. The first reservation "describe[d] a boundary following the ocean side of offshore islands and reefs."[73] The second reservation "contained a boundary description [that began] from 'the line of extreme low water'" and then followed the line of extreme low water, including underwater features.[74] The Supreme Court held that the United States intended to include submerged lands in both reservations because the boundary descriptions "necessarily embraced certain submerged lands."[75]

Here, PLO 829 defines a portion of the western edge of Mendenhall Lake Scenic and Winter Sports Area as "meander[ing the] west shore [of the Mendenhall

---

[71] Docket 11 at 27–28.

[72] *Arctic Coast*, 521 U.S. at 36 ("In construing a single federal instrument creating a reserve, we see no reason to apply the phrase 'expressly retained' differently depending upon whether the lands in question would pass to a State by virtue of a statutory grant or by virtue of the equal footing doctrine, as confirmed by statute.").

[73] *Id.* at 38-39.

[74] *Id.* at 51 (citation omitted).

[75] *Id.* at 38-39, 51.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 16 of 36
Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 16 of 36

River]."[76]  Because the outside edge of the river *is* the boundary of the reservation, the submerged lands are not "merely enclosed within the exterior boundary of the withdrawal," as the State contends; rather, the boundary necessarily encompasses the submerged lands underneath the river.[77]

The reservation's express reference to the river distinguishes this case from *Montana* and *Utah Division of State Lands*.[78] In both of those cases, the Supreme Court concluded that submerged lands beneath certain bodies of water had not been conveyed or reserved, despite the fact that the waters fell within the boundaries of the conveyance or reservation.[79] But neither case involved an instrument or conveyance that referred to submerged lands.[80] Moreover, in each case, the Supreme Court focused on the purpose of the reservation as a critical factor in determining federal intent.[81] As discussed above, the purpose of the reservation here demonstrates a federal intent to include submerged lands in the reservation.

---

[76] Docket 8-12 at 2.

[77] *See* Docket 11 at 29.

[78] *See Montana v. United States*, 450 U.S. 544 (1981); *Utah Div. of State Lands v. United States*, 482 U.S. 193 (1987).

[79] *Montana*, 450 U.S. at 553–54; *Utah Div. of State Lands*, 482 U.S. at 203.

[80] *Montana*, 450 U.S. at 554; *Utah Div. of State Lands*, 482 U.S. at 203.

[81] *Montana*, 450 U.S. at 556 (reasoning that the beds of navigable rivers were not intended to be reserved as part of the Crow Indian reservation because "fishing was not important to [the Crow Indians'] diet or way of life"); *Utah Div. of State Lands*, 482 U.S. at 203 ("[T]he concerns with monopolization and speculation that motivated Congress to enact the 1888 Act had nothing to do with the beds of navigable rivers and lakes.") (citation omitted).

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 17 of 36

Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 17 of 36

### C. Total Number of Acres Reserved

Third, the United States argues that the total acreage reserved necessarily includes the Disputed Submerged Lands because the total number of acres reserved for the Mendenhall Lake Scenic and Winter Sports Area in PLO 829 includes several hundred acres of land underlying Mendenhall Lake and Mendenhall River.[82] The State acknowledges that the reservation's acreage includes the submerged lands, but argues that that the inclusion of the Disputed Submerged Lands in the total acres reserved by PLO 829 does nothing more than demonstrate that the submerged lands are located within the reservation's exterior boundary.[83]

The United States relies on *Idaho v. United States* for its contention that, "when the United States includes lakebed land in its calculation of the acreage it reserved, that demonstrates the United States intended to reserve the land."[84] By the time the Supreme Court considered that case, Idaho did not contest the United States' intent to reserve the submerged lands at issue but instead focused on the second question of whether Congress expressed its intent to defeat Idaho's title to the submerged lands.[85] The Supreme Court noted that Idaho's concession was a

---

[82] Docket 8 at 14.

[83] Docket 11 at 29.

[84] Docket 8 at 14–15 (citing 533 U.S. 262, 274 (2001)).

[85] 533 U.S. at 274.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 18 of 36

Case 3:22-cv-00240-SLG     Document 44     Filed 12/09/24     Page 18 of 36

"sound one" given, in part, the lower court's finding that "the acreage determination of the reserved area in 1883 necessarily included the area of the lakebed."[86]

In this case, the State does not dispute that the 5,815 acres reported as reserved for the Mendenhall Lake Scenic and Winter Sports Area in PLO 829 include the Disputed Submerged Lands.[87]  Just as boundaries that "necessarily embrace[] certain submerged lands" demonstrate federal intent to reserve those submerged lands,[88] PLO 829's acreage calculation that necessarily includes the Disputed Submerged Lands likewise demonstrates federal intent to reserve those lands.

### D.  Name of Reservation

Fourth, the United States asserts that it is significant that the withdrawal was named *Mendenhall Lake* Scenic and Winter Sports Area.  By "naming the reservation for 'Mendenhall Lake,'" the United States claims that it "communicated an intent to withdraw Mendenhall Lake."[89]  The United States asserts that the use of Mendenhall Lake as the identifying feature of the reservation is "particularly pointed" since Mendenhall Glacier could "easily" have been the geographic feature used to name the reservation "if the United States did not intend to withdraw the

---

[86] *Id.*

[87] *See* Docket 11 at 29; Docket 8-12 at 2.

[88] *Arctic Coast*, 521 U.S. at 38–39.

[89] Docket 12 at 12.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 19 of 36

Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 19 of 36

lake."[90]  The State responds that the name of the reservation merely "points to the general area" of where the reservation is, and contends that "lake" is not a "magic word" that automatically indicates an intent to reserve submerged lands.[91]

The Court agrees with the State that the inclusion of the word "lake" in a reservation's name is not enough, on its own, to clearly demonstrate the federal government's intent to reserve submerge lands.  However, the Court finds that the name of the reservation is a factor that supports a finding of federal intent to reserve the submerged land. Considering the name alongside the reservation's purpose and boundaries, it is not plausible that the United States did not intend for the reservation to include its namesake lake.

Because (1) the purpose of reserving Mendenhall Lake Scenic and Winter Sports Area would be undermined if the submerged lands were excluded from the reservation, (2) the boundary of the reservation references and therefore necessarily includes submerged lands, (3) the acreage reserved for Mendenhall Lake Scenic and Winter Sports Area includes submerged lands, and (4) the name of the reservation further suggests an intent to include submerged lands in the reservation, the Court finds that the United States has demonstrated clear federal intent to reserve to the United States the Disputed Submerged Lands.

---

[90] Docket 12 at 12.

[91] Docket 41 at 25–26.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 20 of 36

## II. Federal Expression of Intent to Retain Federal Title to the Submerged Lands within the Reservation

The United States' clear intent to reserve submerged lands is not, on its own, enough to defeat the State's title.[92] Instead, the second prong of the analysis requires an independent finding that the United States expressed its intent to retain federal title to submerged lands within the reservation.[93] The Court "will not infer an intent to defeat a future State's title to inland submerged lands unless the intention was definitely declared or otherwise made very plain."[94] Case law indicates that this expression of intent to retain federal title has generally been evinced by congressional action.[95]

The United States contends that the Alaska Statehood Act ("ASA") clearly expresses federal intent to defeat the State's title to the Disputed Submerged Lands.[96] The United States also maintains that PLO 829 is independently sufficient to express federal intent to defeat the State's title because it was issued

---

[92] *Utah Div. of State Lands*, 482 U.S. at 202; *Idaho*, 533 U.S. at 273.

[93] *Glacier Bay*, 545 U.S. at 100 (citing *Arctic Coast,* 521 U.S. at 36).

[94] *Id.* (internal quotation marks omitted).

[95] *See Utah Div. of State Lands*, 482 U.S. at 202 (requiring, at step two, that the United States "establish that *Congress* affirmatively intended to defeat the future State's title" (emphasis added)).

[96] Docket 8 at 18–22.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 21 of 36

Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 21 of 36

pursuant to the authority granted to the Executive by Congress through the Pickett Act.[97]  The Court will address each basis in turn.

### A.    Alaska Statehood Act

*Arctic Coast* and *Glacier Bay* establish that the United States may express an intent to defeat state title to submerged lands if the Executive puts Congress on notice that the Executive has withdrawn the submerged lands and Congress ratifies the withdrawal.[98]   Congress may ratify a withdrawal "by explicitly recognizing, at the point of Alaska's statehood, an executive reservation that clearly included submerged lands."[99]   Such a congressional ratification must "definitely declare[] or otherwise ma[k]e very plain" an intent to defeat state title.[100] The Court addresses in turn whether there was sufficient notice by the Executive and ratification by Congress here.

---

[97] Docket 8 at 22–24.

[98] *Glacier Bay*, 545 U.S. at 104–08 (holding that the presidential proclamations creating and expending Glacier Bay National Monument were ratified by § 6(e) of the ASA); *Arctic Coast*, 521 U.S. at 45 ("[T]he 1923 Executive Order reflected a clear intent to include submerged lands within the [National Petroleum] Reserve[-Alaska]. That instrument placed Congress on notice that the President had construed his reservation authority to extend to submerged lands and had exercised that authority to set aside uplands and submerged lands in the Reserve to secure a source of oil for the Navy. Congress acknowledged the United States' ownership of and jurisdiction over the Reserve in § 11(b) of the Statehood Act. Accordingly, Congress ratified the inclusion of submerged lands within the Reserve, whether or not it had intended the President's reservation authority under the Pickett Act to extend to such lands.").

[99] *Arctic Coast*, 521 U.S. at 44.

[100] *Id.* at 34 (internal quotation marks omitted) (quoting *United States v. Holt State Bank*, 270 U.S. 49, 55 (1926)).

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 22 of 36
Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 22 of 36

### 1. Notice to Congress

The parties dispute whether Congress was on notice of PLO 829—and therefore on notice that the Secretary had reserved the Disputed Submerged Lands—at the time it passed the ASA.[101] The United States maintains that Congress had constructive and actual knowledge of PLO 829 when it passed the ASA, such that the ASA ratified the reservation and expressed Congress' intent to defeat state title.[102] The United States contends that Congress was on notice for two reasons. First, the Secretary "published [the] PLO in the Federal Register . . ., which provided Congress [with] constructive notice of the reservation even before the Secretary sent actual notice."[103] Second, the Secretary provided Congress with "actual notice" that the United States had reserved the Disputed Submerged Lands, by sending to Congress a list of orders affecting public lands in Alaska, as well as maps of the approximate location of withdrawals and reservations, while Congress was considering Alaska's admission into the Union.[104] "The maps and the list of public land orders included PLO 829, and the list identified PLO 829 as reserving 'Mendenhall Lake' and a total of 5,815 acres."[105] The State maintains

---

[101] *See* Docket 8 at 18–20; Docket 11 at 37–40.

[102] Docket 8 at 18–20.

[103] Docket 8 at 19.

[104] Docket 8 at 19.

[105] Docket 8 at 19.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 23 of 36

Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 23 of 36

that Congress was not on notice of PLO 829 when it passed the ASA because one of the lists provided to Congress was published after the ASA was passed in the House and the Senate, and because the maps provided to Congress incorrectly located the withdrawal of the Mendenhall Lake Scenic and Winter Sports Area.[106]

In *Arctic Coast*, the Supreme Court held that Congress was on notice of an executive withdrawal where there was (1) an application to withdraw lands within the reservation from "all forms of appropriation under the public land laws except mineral leasing and mining locations,"[107] (2) formal notice of the application was published in the Federal Register before statehood, and (3) "while Congress was considering Alaska's admission to the union, the Secretary of the Interior informed Congress that the application for the reservation was pending and submitted maps showing the areas as a federal enclave embracing submerged lands."[108]

In the instant case, the Court can discern from documents incorporated by reference into the Complaint and from public records that the same kinds of submissions that the Supreme Court held constituted sufficient notice to Congress in *Arctic Coast* were submitted to Congress here. In 1951, the Forest Service requested that the Secretary of the Interior withdraw "Mendenhall Lake" "from all

---

[106] Docket 11 at 36–43. The State also argues that Congress was not on notice of the withdrawal of the Disputed Submerged Lands because PLO 829 did not clearly show an intent to reserve submerged lands. As discussed *supra* Section I, the Court disagrees.

[107] *Arctic Coast*, 521 U.S. at 52 (internal quotations omitted).

[108] *Id.* at 56.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 24 of 36

forms of location and entry under the public land laws, including the U.S. Mining Laws" under the authority granted by the President and Congress.[109]  This request mirrors the application submitted in *Arctic Coast.*   Then, in 1952, the Secretary of the Interior issued PLO 829, granting the request and withdrawing "Mendenhall Lake Scenic and Winter Sports Area" "from all forms of appropriation under the public-land laws, including the mining laws but not the mineral-leasing laws" and reserving it "for use by the Forest service" as a recreation area.[110]  PLO 829, like the formal notice in *Arctic Coast*, was published in the Federal Register.[111]  Finally, the Department of the Interior published a written document stating that PLO 829 withdrew "Mendenhall Lake." This document was provided to Congress at least in July 1958, if not before.[112]  Although the United States initially, in error, filed in this case a version of the checklist that was published in 1959, after Alaska had become a state,[113] it later provided another version of the checklist that was published in June 1952, which shows that Congress was on notice of the reservation pre-statehood.[114]  This notice to Congress was at least as complete as

---

[109] Docket 8-11 at 1.

[110] Docket 8-12; *see* Docket 1 at ¶ 38.

[111] *See* Docket 8-12; Docket 11-20.

[112] *See* Docket 12-1 (dated June 1952); Docket 8-20 (dated July 1958).

[113] Docket 8-19.

[114] Docket 12-1. This Court has previously recognized that the Department of the Interior prepared the Checklist of Orders Affecting Public Lands in Alaska "to accompany the 1958 Atlas" sent to Congress for its work on the Alaska Statehood Act. *Peratrovich v. United States*,

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 25 of 36
Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 25 of 36

the notice of the withdrawal in *Arctic Coast*.  In that case, the Forest Service had only *applied* for the withdrawal of the reservation at the time of statehood;[115] here, Congress was made aware of the completed executive withdrawal.  Accordingly, the Court finds that Congress was on notice, when it passed the ASA, that the Executive intended to reserve to the United States the Disputed Submerged Lands.

### 2.      Congressional Ratification

Next, the United States contends that Congress ratified the Executive's reservation of the Mendenhall Lake Scenic and Winter Sports Area through three provisions of the Alaska Statehood Act: (1) Section 4, through which the State of Alaska disclaims ownership of lands not granted to it under the ASA; (2) Section 5, through which the United States retains title to lands it held prior to Alaska's admission to the Union, subject to the exceptions in Section 6; and (3) Section 6(a), through which the State of Alaska is, among other things, permitted to select 400,000 acres of national forests "which are vacant and unappropriated" to be conveyed from the United States to Alaska.[116] The Court addresses these three provisions in turn.

---

Case No. 3:92-cv-0734-HRH, 2011 WL 13210230, at *11 (D. Alaska May 31, 2011).

[115] *Arctic Coast*, 521 U.S. at 59–60.

[116] Docket 8 at 20; Alaska Statehood Act, Pub. L. No. 85-508, § 6(a), 72 Stat. 339, 340 (1958) ("For the purposes of furthering the development of and expansion of communities, the State of Alaska is hereby granted and shall be entitled to select, within thirty-five years after the date of the admission of the State of Alaska into the Union, from lands within national forests in Alaska which are vacant and unappropriated at the time of their selection not to exceed four hundred

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 26 of 36

Case 3:22-cv-00240-SLG      Document 44      Filed 12/09/24      Page 26 of 36

First, the United States asserts that Section 4 of the ASA clearly expresses Congress's intent to defeat state title to submerged lands.[117] Section 4 of the ASA includes a provision that the State disclaims "all right and title to any lands . . . not granted or confirmed to the State . . . under the authority of [the ASA]."[118] Given that this proviso only disclaims title to lands not granted to the State under other provisions of the ASA, Section 4 on its own says little, if anything, about federal intent to retain title to submerged lands within the reservation here. For the United States to demonstrate that the general disclaimer in Section 4 applies, it must show that the provision of the ASA applying the SLA to Alaska did not result in the transfer of the Disputed Submerged Lands to the State. Without such a showing, the disclaimer in Section 4 has no bearing on the Disputed Submerged Lands.

---

thousand acres of land, and from the other public lands of the United States in Alaska which are vacant, unappropriated, and unreserved at the time of their selection not to exceed another four hundred thousand acres of land, all of which shall be adjacent to established communities or suitable for prospective community centers and recreational areas. Such lands shall be selected by the State of Alaska with the approval of the Secretary of Agriculture as to national forest lands and with the approval of the Secretary of the Interior as to other public lands: *Provided*, That nothing herein contained shall affect any valid existing claim, location, or entry under the laws of the United States, whether for homestead, mineral, right-of-way, or other purpose whatsoever, or shall affect the rights of any such owner, claimant, locator, or entryman to the full use and enjoyment of the land so occupied: *Provided further*, That for the purposes of this section the term 'public lands of the United States in Alaska which are vacant, unappropriated, and unreserved' shall include, without limiting the use thereof, the retained or reserved interest of the United States in lands which have been disposed of with a reservation to the United States of all minerals or any specified mineral or minerals.")

[117] Docket 8 at 20.

[118] § 4, 72 Stat. at 339.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 27 of 36

Second, the United States asserts that Section 5 of the ASA clearly expresses Congress's intent to defeat state title.[119] Section 5 of the ASA sets forth a general rule that the United States retains title to all property it held prior to Alaska's admission to the Union, while the State of Alaska acquires title to all property previously held by the Territory of Alaska or its subdivisions.[120] However, Section 5 provides that the United States' retention of title is subject to the exceptions set forth in Section 6 of the ASA. Accordingly, as with Section 4, the Court will not look at Section 5 in isolation; it must also look to the exceptions in Section 6.

With respect to Section 6, the United States asserts that Section 6(a) of the ASA clearly expresses congressional intent to defeat state title to the Disputed Submerged Lands.[121] Section 6(a) of the ASA entitles the State to select 400,000 acres of national forests that are "vacant and unappropriated."[122] The United States contends that "[b]y excluding appropriated lands from its grant to the State, Congress clearly expressed its intent that the United States retain title to

---

[119] Docket 8 at 20.

[120] § 5, 72 Stat. at 340.

[121] Docket 8 at 20–21.

[122] § 6(a), 72 Stat. at 340.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 28 of 36

Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 28 of 36

appropriated lands [within national forests] that were subject to secondary reservations."[123]

Glacier Bay is instructive on this point. In Glacier Bay, the Supreme Court held that a proviso limiting a land grant to the State evinced Congress's intent to retain title to submerged lands.[124] Specifically, a proviso in Section 6(e) of the ASA excepted from transfer to the State "lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife."[125] The Supreme Court held that this proviso prevented the transfer of submerged lands within Glacier Bay National Monument (now Glacier Bay National Park) to the State even though the monument was not covered by the initial clause of Section 6(e), which directed a transfer to Alaska of federal property covered by three specific federal game and wildlife laws.[126] Section 6(e)'s proviso operated "affirmatively and independently, as an expression of Congress' intent to retain federal ownership over all lands within such reservations."[127]

Here, as in Glacier Bay, there is an applicable proviso limiting a land grant to the State: Section 6(a) grants the State 400,000 acres within the national forests

---

[123] Docket 12 at 15; see Docket 8 at 20.

[124] See Glacier Bay, 545 U.S. at 104–07.

[125] Id. at 105.

[126] Id. at 105–06. The Supreme Court held that the proviso's use of the general word "lands"—compared with the initial clause's transfer of specific "property"—implied that the scope of the proviso was not limited to what was specified at the outset of Section 6(e). Id. at 107.

[127] Id. at 108.

Case No. 3:22-cv-0240-SLG, State of Alaska v. United States
Order on Motion to Dismiss
Page 29 of 36

but excludes from that grant lands that are not "vacant and unappropriated."[128] Mendenhall Lake Scenic and Winter Sports Area had been withdrawn for a particular public purpose at the time of statehood and was therefore not "unappropriated."[129] Specifically, the submerged land was appropriated for scenic preservation, recreation, and winter sports. Accordingly, the Court finds that Section 6(a) of the ASA expresses a clear congressional intent to retain federal title to the Disputed Submerged Lands.

The State argues that Section 6(m) of the ASA, which applies the SLA to the State of Alaska,[130] "plainly grants title to submerged lands underlying navigable waters" and overrides other provisions of the ASA.[131] The grant of title provided by Section 6(m) is not as absolute as the State suggests. In applying the SLA to the State, Section 6(m) provides for a *presumption* of State title to submerged lands under navigable waters; but that presumption can be overcome if the United States sets aside submerged lands "before statehood in a way that shows an intent to retain title" and the requisite intent is "definitely declared or otherwise made very

---

[128] § 6(a), 72 Stat. at 340.

[129] *See Appropriation of Land,* Black's Law Dictionary (4th ed. 1951) (defining "appropriation of land" as the "act of selecting, devoting, or setting apart land for a particular use or purpose, as where land is appropriated for public buildings, military reservations, or other public uses.").

[130] § 6(m), 72 Stat. at 343 ("The Submerged Lands Act of 1953 shall be applicable to the State of Alaska and the said State shall have the same rights as do existing States thereunder.") (citation omitted).

[131] Docket 11 at 41.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 30 of 36

plain."[132] While Section 6(m) may overcome Sections 4 and 5 of the ASA, because the scope of each is expressly subject to the ASA's other provisions, it does not overcome Section 6(a). *Arctic Coast* established, and *Glacier Bay* reaffirmed, that submerged lands expressly retained by the federal government under other subsections of Section 6 of the ASA are not vested in the State by Section 6(m).[133] The State's contention otherwise is therefore unavailing.[134]

Nor does this reading of Section 6(a) imply that all national forest lands are reserved to the federal government, as the State suggests it must.[135] The Court's reasoning is based on PLO 829's reservation of Mendenhall Lake Scenic and Winter Sports Area, which—in addition to being appropriated for a particular purpose—shows the United States' intent to reserve the Disputed Submerged Lands and of which Congress was on notice when it passed the ASA. Accordingly, the Court concludes that Section 6(a) of the ASA expresses a clear congressional intent to defeat the State's title to the Disputed Submerged Lands.

### B. PLO 829

Even assuming *arguendo* that Congress did not ratify the retention of the submerged lands within the Mendenhall Lake Scenic and Winter Sports Area

---

[132] *Glacier Bay*, 545 U.S. at 78–79 (internal quotation marks and citation omitted).

[133] *Id.* at 107–08 (citing *Arctic Coast*, 521 U.S. at 56–57).

[134] Docket 11 at 41 (asserting that "Section 6(m) plainly grants title to submerged lands").

[135] *See* Docket 8 at 20–21.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 31 of 36
Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 31 of 36

through Section 6(a) of the ASA, the Court finds that PLO 829 is independently sufficient to establish the United States' clear expression of its intent to retain title to the Disputed Submerged Lands.

The United State contends that PLO 829 independently demonstrates a clear intent to defeat state title to the Disputed Submerged Lands because the Secretary exercised his authority from Congress, pursuant to the Pickett Act, to withdraw submerged lands.[136] In response, the State asserts that the Pickett Act contains no express grant of authority to the Executive to withdraw submerged lands[137] and that, in any event, an executive withdrawal alone is not sufficient to defeat state title.[138]

In both *Arctic Coast* and *Glacier Bay*, the Supreme Court suggested in dicta that executive action can demonstrate both an intent to include submerged lands within a federal reservation and the requisite expression of intent to defeat the State's title. In *Arctic Coast*, the Special Master concluded that "the Pickett Act gave the President the express authority to dispose of [submerged lands],"[139] and that the subsequent 1923 Executive Order creating the National Petroleum Reserve-Alaska "reflected the clear intent to reserve all submerged lands within

---

[136] Docket 8 at 22.

[137] Docket 11 at 34.

[138]  Docket 11 at 36.

[139] *Arctic Coast*, 521 U.S. at 44.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 32 of 36

the boundaries of the Reserve and to defeat the State's title to the submerged lands in question."[140]  The Supreme Court ultimately did not rely on this conclusion, but instead held that the submerged lands were retained by the United States on the alternative ground that Congress had ratified the 1923 Executive Order in Section 11(b) of the ASA.[141]  The Supreme Court, however, did not reject the Special Master's conclusion as incorrect.[142]  In *Glacier Bay*, the Supreme Court went a step further by noting that "[t]he requisite expression of intent might conceivably reside in the very [executive] proclamations that invoked the Antiquities Act of 1906 to create and then expand Glacier Bay National Monument."[143]  The Antiquities Act "empowers the President to reserve submerged lands" and an essential purpose of monuments created pursuant to the Antiquities Act was "to conserve the scenery and the natural and historic objects and the wild life therein."[144] From these two premises, the Supreme Court concluded that "it would require little additional effort to reach a holding that the Antiquities Act itself delegated to the President sufficient power not only to reserve

---

[140]  *Arctic Coast*, 521 U.S. at 33.

[141] *Id.* at 44 ("Assuming, *arguendo*, that Alaska's construction of the Pickett Act is correct, it does not control the outcome of this case. We conclude that Congress ratified the terms of the 1923 Executive Order in § 11(b) of the Statehood Act.").

[142] *See Arctic Coast*, 521 U.S. at 44.

[143] *Glacier Bay*, 545 U.S. at 103.

[144] *Id.* (internal quotation marks omitted).

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 33 of 36
Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 33 of 36

submerged lands but also to defeat a future State's title to them."[145]  Although the Supreme Court ultimately decided *Glacier Bay* by holding that Congress expressed its intent to defeat state title through Section 6(e) of the ASA,[146] the Court agrees with the logic of the Supreme Court's alternative reasoning: when an act of Congress delegates power to the Executive to reserve submerged lands and a purpose of a reservation created pursuant to the act is conservation, an executive reservation may defeat state title.

As relevant here, the Pickett Act authorizes the Executive to withdraw "any of the public lands of the United States including the District of Alaska" for various purposes, including "public purposes to be specified in the orders of withdrawals."[147]  In *Tustumena Lake*, the Ninth Circuit reversed the lower court's finding that "public lands," as a statutory phrase applied to Alaska, "did not include the land under the water."[148]  "In construing the pertinent Alaskan statutes, the

---

[145] *Id.*

[146] *Id.* at 103–04, 110 ("We need pursue this alternative basis no further, however. In our view the provisions of the ASA themselves suffice to overcome the state ownership presumption arising from the equal-footing doctrine and the SLA and to reserve the submerged lands in Glacier Bay to the United States . . . This expression of intent encompassed Glacier Bay National Monument, which was set aside 'for the protection of wildlife' within the meaning of [ASA] § 6(e). The text [of the ASA] thus defeated the presumption that the new State of Alaska would acquire title to the submerged lands underlying the monument's waters, including the inland waters of Glacier Bay.").

[147] Docket 11-22 (Act to authorize the President of the United States to make withdrawals of public lands in certain cases (the Pickett Act), ch. 421, 36 Stat. 847, § 1 (1910)).

[148] *Tustumena Lake*, 423 F. 2d at 766. This stands in contrast to cases construing the general land laws, because the Act providing a civil government in Alaska, enacted May 17, 1884, 23 Stat. 24, 26, provided that the general land laws of the United States would not be applicable to the Territory of Alaska.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 34 of 36
Case 3:22-cv-00240-SLG     Document 44     Filed 12/09/24     Page 34 of 36

courts have consistently held that the words 'public domain', 'public lands' and 'land', include land under water."[149]  Moreover, the text of the Pickett Act makes clear that it necessarily authorized reservations of submerged lands because it contemplates that land will be reserved pursuant to the statute for public purposes including "water-power sites" and "irrigation," both of which may involve the use of submerged lands.[150]  Accordingly, the Pickett Act's authorization for the President to withdraw and reserve for public purposes "any of the public lands of the United States including the District of Alaska" included submerged lands.[151]

And the public purposes served by Pickett Act withdrawals include conservation of land. As discussed *supra* Section I(A), the public purpose of withdrawing the Mendenhall Lake Scenic and Recreation Area in PLO 829 was to conserve the land, including submerged lands, for scenic and recreational purposes. The Court therefore finds that PLO 829 independently clearly expresses the United States' intent to defeat the State's title to the Disputed Submerged Lands.

## CONCLUSION

Because the United States has demonstrated that it clearly intended to include the Disputed Submerged Lands within the Mendenhall Lake Scenic and

---

[149] *Tustumena Lake*, 423 F. 2d at 766.

[150] Docket 11-22.

[151] Docket 11-22.  This power was delegated to the Secretary through Executive Order No. 9337. Docket 11-21.

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 35 of 36
Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 35 of 36

Winter Sports Area and expressed its intent to retain federal title to those Disputed Submerged Lands within the reservation so as to defeat the State's title, the United States' Motion to Dismiss at Docket 8 is **GRANTED**.

The Clerk of Court is instructed to enter a final judgment for the United States accordingly.

DATED this 9th day of December 2024, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:22-cv-0240-SLG, *State of Alaska v. United States*
Order on Motion to Dismiss
Page 36 of 36
Case 3:22-cv-00240-SLG    Document 44    Filed 12/09/24    Page 36 of 36